UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
WILLIAM PREUSS, ROBERT BLOOMER, and FRANCIS
XAVIER CAFIERO,

                              Plaintiffs,

                - against -

KOLMAR LABORATORIES, INC.,

                            Defendant.
---------------------------------------------------------------------x

**OPINION AND ORDER**

No. 10-CV-6375 (CS)

Appearances:

Phyllis Gelman
Avi Mermelstein
Gelman & Jones, LLP
New York, New York
*Counsel for Plaintiffs*

Anthony DiOrio
Nina Massen
Jackson Lewis LLP
White Plains, New York
*Counsel for Defendant*

Seibel, J.

      Before the Court are the Motion for Summary Judgment of Defendant Kolmar

Laboratories, Inc., (Doc. 45), and the Cross-Motion of Plaintiffs William Preuss, ("Preuss"),

Robert Bloomer ("Bloomer"), and Francis Xavier Cafiero ("Cafiero"), (collectively, the

"Plaintiffs") to preclude certain affirmations submitted by Defendant, (Doc. 55).  For the reasons

stated below, Plaintiffs' Motion to Strike is GRANTED IN PART and DENIED IN PART and

Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I. <u>Motion to Strike</u>

In support of its Motion for Summary Judgment, Defendant has submitted the following documents:

- Affirmation of Thad Dussinger, (Massen MSJ Aff. Ex. I ("Dussinger Aff."))[1];

- Affirmation of Clara Bock, (Massen MSJ Aff. Ex. J ("Bock Aff."));

- Affirmation of Concita May, (Massen MSJ Aff. Ex. K ("May Aff."));

- Affirmation of Richard Matyus, (Massen MSJ Aff. Ex. N ("Matyus Aff.")); and

- Affirmation of Lisa Smith, (Massen MSJ Aff. Ex. P ("Smith Aff.")).

As a preliminary matter, I must determine exactly what should and should not be part of the record on Defendant's Motion for Summary Judgment.

### A. *Legal Standard*

Federal Rule of Civil Procedure 26(a) obligates each party to provide the opposing party with, *inter alia*, the name of "each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). Moreover, where a disclosing party "learns that in some material respect the disclosure or response is incomplete or incorrect," that party is required to supplement or correct the disclosure in a timely manner. Fed. R. Civ. P. 26(e)(1)(A). Federal Rule of Civil Procedure 37(c)(1) provides in relevant part that any "party [that] fails to provide information or identify a witness as required by Rule 26(a) . . . is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The rule's purpose is to "prevent the practice

---

[1] "Massen MSJ Aff." refers to the Affidavit of Nina Massen, Esq. in Support of Defendant Kolmar Laboratories, Inc.'s Motion for Summary Judgment.  (Doc. 49.) Plaintiffs have submitted identical copies of the five affirmations in support of their Motion to Strike.  (*See* Affirmation of Phyllis Gelman in Support of Plaintiff's [*sic*] Motion to Strike ("Gelman MTS Aff."), (Doc. 57), Exs. 4-8.)

of 'sandbagging' an opposing party with new evidence." *Ebewo v. Martinez*, 309 F. Supp. 2d

600, 607 (S.D.N.Y. 2004); *see Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93

(S.D.N.Y. 2002) ("The purpose of these rules is to avoid surprise or trial by ambush.") (internal

quotation marks omitted).

A party may "defend non-disclosure on the basis that it was substantially justified or

harmless." *U.S. Licensing Assocs., Inc. v. Rob Nelson Co.*, No. 11-CV-4517, 2012 WL 1447165,

at *5 (S.D.N.Y. Apr. 26, 2012). Substantial justification is defined as "justification to a degree

that could satisfy a reasonable person that parties could differ as to whether the party was

required to comply with the disclosure request." *Am. Stock Exch.*, 215 F.R.D. at 93 (internal

quotation marks omitted). "The test of substantial justification is satisfied if there exists a

genuine dispute concerning compliance." *Henrietta D. v. Giuliani*, No. 95-CV-641, 2001 WL

1602114, at *5 (E.D.N.Y. Dec. 11, 2001) (internal quotation marks omitted). Failure to comply

with Rule 37(c)(1) is harmless "when there is no prejudice to the party entitled to the disclosure."

*Am. Stock Exch.*, 215 F.R.D. at 93.

Despite Rule 37(c)(1)'s self-executing nature, courts have broad discretion in

determining whether and how to impose sanctions. *See Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D.

50, 68 (E.D.N.Y. 2012)*; Kuntsler v. City of N.Y.*, 242 F.R.D. 261, 265 (S.D.N.Y. 2007). Further,

"[p]reclusion of evidence is generally a disfavored action." *Am. Stock Exch.*, 215 F.R.D. at 93;

*see Lujan*, 284 F.R.D. at 68 ("Preclusion is a harsh remedy that should only be imposed in rare

situations.") (internal quotation marks omitted). "While a finding of bad faith is not required to

justify preclusion of evidence under Rule 37, a court may consider bad faith in its analysis."

*Lujan*, 284 F.R.D. at 68. In determining whether to preclude evidence under Rule 37(c)(1),

courts examine: "(1) the party's explanation for the failure to comply with the disclosure

requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (alterations and internal quotation marks omitted); *see Lujan*, 284 F.R.D. at 68; *U.S. Licensing Assocs.*, 2012 WL 1447165, at *5.

   B.  *Analysis*

Defendant concedes that the affiants were not identified in its initial Rule 26 disclosures as individuals likely to have discoverable information,[2] nor were they identified in its numerous supplemental disclosures.[3]  (*See* Ps' Mem. 2; D's Opp. 2-3.)[4]  Rather, Defendant contends that it was not obligated to supplement its disclosures with information about the affiants because either their existence was "made known to [Plaintiffs] during the discovery process," or Plaintiffs were aware of the information contained in the affirmations, and thus Defendant's non-disclosure was harmless.  (D's Opp. 1-2 (quoting Fed. R. Civ. P. 26(e)).)

   1.  The Dussinger, Matyus, and Bock Affirmations

Dussinger joined Defendant in 2007, and he became Manager of the Logistics Department in 2008.  (Dussinger Aff. ¶ 5-6.)  While Bloomer was employed in the Logistics Department, Keith Baker was his direct supervisor, and Dussinger was his department manager. (*Id.* ¶ 6.)  In January 2010, Dussinger transferred to the Purchasing Department as the Purchasing Costing Manager.  (*Id.* ¶ 3.)  Cafiero was recalled to the Purchasing Department the same day,

---

[2] Plaintiffs filed their Complaint ("Compl.") on August 25, 2010.  (Doc. 1.)  Defendant was initially represented by Benesch Friedlander Coplan & Aronoff LLP, and that firm prepared, served, and filed Defendant's Rule 26 initial disclosures, as well as Defendant's Responses and Objections to Plaintiffs' First Interrogatories.  (Affirmation of Nina Massen, Esq. in Opposition to Plaintiffs' Motion to Strike ("Massen MTS Aff."), (Doc. 59), ¶ 3.)

[3] Jackson Lewis LLP entered its appearance as counsel on October 20, 2011 and supplemented Defendant's disclosures on 11 separate occasions.  (Massen MTS Aff. ¶ 3.)

[4] "Ps' Mem." refers to the Memorandum of Law of Plaintiffs in Support of Their Motion to Strike.  (Doc. 56.)  "D's Opp." refers to Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Strike.  (Doc. 58.)

and Dussinger became his immediate supervisor.  (*Id.* ¶ 25; Massen MTS Aff. Ex. F., at 3.)

Matyus, in turn, was Dussinger's direct supervisor.  (Matyus Aff. ¶ 4.)  Bock, a Purchasing

Agent at the company, worked with Cafiero in the Purchasing Department until his termination

and spoke with Cafiero "every day."  (Bock Aff. ¶¶ 3, 5; Massen MTS Aff. Ex. B, at 3-4.)

Defendant has submitted Dussinger's affirmation to explain:  (1) the sequence of events

leading up to Bloomer's layoff, (Dussinger Aff. ¶¶ 7-24); and (2) Cafiero's alleged

unsatisfactory performance in the Purchasing Department, which culminated in his absence at an

important meeting and his subsequent termination, (*id.* ¶¶ 25-38).[5]  Matyus's affirmation echoes

Dussinger's, and details Defendant's dissatisfaction with Cafiero's performance, his failure to

report to work for the meeting, and Matyus's decision to terminate him.  (*See generally* Matyus

Aff.)  Likewise, Bock offers testimony to support Defendant's argument that Cafiero was

insubordinate.  (Bock Aff. ¶¶ 7, 11-13.)

Defendant contends that it was not obligated to disclose these individuals as potential

witnesses because Plaintiffs should have been aware of their existence and significance, not only

through discovery, but also from their respective relationships at the company.  (D's Opp. 7.)  In

fact, Defendant alleges that Cafiero called Bock in March 2012 and attempted to influence her

potential testimony.  (*Id.* at 9; Massen MTS Aff. Ex. C.)  For these same reasons, Defendant

argues that Plaintiffs were not prejudiced by Defendant's failure to disclose.

Of significance is the fact that Plaintiffs served document requests on Defendant seeking

Dussinger's and Matyus's personnel files, as individuals who supervised Plaintiffs or

participated in the decision to lay off or terminate Plaintiffs, and all documents within

Dussinger's or Matyus's possession.  (*See* Massen MTS Aff. Ex. I, ¶¶ 3(a), (d), 13, 16.)

---

[5] These incidents are discussed in greater detail in Section II, *infra*.

Moreover, all three affiants' names were brought up several times in depositions, by Plaintiffs themselves as well as by some of Defendant's witnesses. (*See* Massen MTS Aff. Exs. E-G.) Likewise, a memorandum written by Dussinger concerning Cafiero's conduct was entered as an exhibit at Cafiero's deposition. (*See id.* Ex. D.)

Although Defendant should have complied more diligently with the discovery rules, its failure to disclose Dussinger, Matyus, or Bock as potential witnesses does not warrant the severe sanction of striking their testimony because Plaintiffs were well aware of their identities and the scope of their knowledge. *See LaVigna v. State Farm Mut. Auto. Ins. Co.*, 736 F. Supp. 2d 504, 511 (N.D.N.Y. 2010) (motion to strike denied where affiant supervised plaintiff during period leading up to termination, plaintiff had awareness of affiant's role and involvement of events at issue, and several documents mentioning affiant were turned over); *Morgenstern v. Cnty. of Nassau*, No. 04-CV-58, 2008 WL 4449335, at *2 (E.D.N.Y. Sept. 29, 2008) (harmless error where plaintiff was aware of affiant's role in lawsuit, testified about affiant's role in deposition, and served document request on defendant seeking documents from affiant); *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01-CV-1047, 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) ("[A] failure to disclose witness information is harmless if the other party was well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial.") (internal quotation marks omitted); *cf. Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 727 (S.D.N.Y. 2011) (affidavits not stricken where non-disclosed affiants were mentioned at depositions), *vacated in part on other grounds sub nom. Marvel Characters, Inc. v. Kirby*, No. 11-CV-3333, 2013 WL 4016875 (2d Cir. Aug. 8, 2013).

Although this is not a case "where the disclosing party was unable to comply with its obligations through no fault of its own," the identities and scope of knowledge of these three

affiants were known to Plaintiffs, they were free to depose the affiants, and the affirmations are largely duplicative of other evidence in the record.  *See LaVigna*, 736 F. Supp. 2d at 511.  Thus, Defendant's failure to disclose the affiants as individuals likely to have discoverable information did not prejudice Plaintiffs, and preclusion is not warranted.

Accordingly, I may consider the affirmations of Dussinger, Matyus, and Bock in resolving Defendant's motion.  Should Plaintiffs wish to depose any of those witnesses between now and trial, they may do so, with Defendant bearing the expenses other than attorney's fees. In addition, Defendant shall pay Plaintiffs' attorneys' fees in connection with the Motion to Strike.  *See* Fed. R. Civ. P. 37(c)(1); *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First, LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012); *Triola v. Snow*, No. 01-CV-1603, 2010 WL 5335104, at *1 (E.D.N.Y. Dec. 21, 2010); *In re Kreta Shipping, S.A.*, 181 F.R.D. 273, 278 (S.D.N.Y. 1998).

### 2.  The May Affirmation

May is a 69 year-old Switchboard Operator for Defendant.  (May Aff. ¶ 3.)  May's affirmation states that she is a member of a local "Red Hat Society," a membership organization open to women age 50 and over.  (*Id.* ¶ 5.)  She also states that identifying the Red Hat Society with older women is not ageist, as the purpose of the organization is to celebrate women of a certain age.  (*Id.* ¶ 6.)  Plaintiffs contend that Bill Luckey, Defendant's Director of Operations, would use the term "Red Hat Society" as a derogatory way to refer to the older women in the lipstick assembly portion of Defendant's operation who worked slowly.  (Ps' Opp. 3, 9.)[6]

In addition to Defendant's failure to disclose May's existence pursuant to Rule 26, Plaintiffs argue that May's affirmation should be stricken as irrelevant.  (Ps' Mem. 9.)

---

[6] "Ps' Opp." refers to Plaintiffs' [*sic*] Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment."  (Doc. 50.)

Specifically, Plaintiffs contend that the existence of an actual "Red Hat Society" does not change the fact that Luckey used the term in a derogatory manner.  (*Id.*)  In response, Defendant states that it failed to disclose May's existence because its counsel did not ask whether anyone at the company was affiliated with the Red Hat Society until counsel began drafting the motion for summary judgment.  (D's Opp. 13.)[7]  Defendant further contends that because Preuss testified that the Red Hat Society was a "well known nickname" for a group of older lipstick ladies, Plaintiffs cannot claim they are prejudiced by May's affirmation.  (*Id.* at 13.)

Putting aside Defendant's failure to comply with Rule 26(a), May's affirmation should largely be stricken as irrelevant.  Evidence presented in connection with summary judgment motions must be admissible in evidence, *see, e.g.*, Fed. R. Civ. P. 56(c)(4); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008), and "[i]rrelevant evidence is not admissible," Fed. R. Evid. 402.  "Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

Defendant contends that May's affirmation is relevant because it "demonstrate[s] that referring to individuals as members of the Red Hat Society is not objectively hostile."  (D's Opp. 13.)  To establish a hostile work environment, a plaintiff must prove, among other things, that an objectively reasonable employee would perceive the environment to be hostile.  *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (citing *Harris v. Forklift Sys., Inc.*, 510

---

[7] Defendant also contends that non-disclosure of May and Smith (who is discussed below) was permitted because until revealed as part of Defendant's motion papers, their affirmations are privileged as attorney work-product.  (D's Opp. 12-13.)  Defendant's argument borders on the frivolous.  Plaintiffs are not contending that the affirmations' contents needed to be disclosed pursuant to Rule 26(a) – only the affiants' identities.  Defendant cites *Institute for Development of Earth Awareness v. People for Ethical Treatment of Animals*, 272 F.R.D. 124, 125 (S.D.N.Y. 2011) to support its point.  (D's Opp. 12.)  In that case, however, the affiants were named in the defendant's Rule 26(a) disclosure.  *Inst. for Dev. of Earth Awareness*, 272 F.R.D. at 125.  What the plaintiff was seeking there were drafts of the affidavits – exchanged between the defendant's counsel and the affiants – which the court correctly concluded was a classic example of work product.  *Id.*  I am surprised that Defendant's counsel is attempting to equate the two situations.

U.S. 17, 21-22 (1993)).  There is no indication, however, that May knew the statements Plaintiffs

attribute to Luckey or the context in which he referred to the Red Hat Society.  May's

affirmation merely states that in her opinion, referring to the Red Hat Society or identifying it

with older women is not "ageist."  (May Aff. ¶ 6.)  Such opinion, divorced from the factual

context at issue, is not helpful to the fact-finder.  *See* Fed. R. Evid. 701.  While the fact that an

organization called the Red Hat Society exists may bear some relevance to whether an

objectively reasonable employee would perceive Luckey's reference to the Red Hat Society to be

hostile or ageist, May is no better situated than the jury to reach a useful opinion on that issue.

Even if May's affirmation were wholly relevant, Defendant's failures to identify May as

a person with relevant knowledge and to disclose the May affirmation until after the close of

discovery are neither substantially justified nor harmless.  Defendant had almost two and a half

years to seek out an affiliated member of the Red Hat Society, yet Defendant offers no

explanation for its failure to do so.[8]  *See Krawec v. Kiewit Constructors, Inc.*, 11-CV-123, 2013

WL 1104414, at *7 (S.D.N.Y. Mar. 1, 2013) (no substantial justification where party did not

explain failure to comply with Rule 26(a)); *Haas v. Del. & Hudson Ry. Co.*, No. 04-CV-1503,

2007 WL 766324, at *3 (N.D.N.Y. Mar. 8, 2007) (same), *aff'd*, 282 F. App'x 84 (2d Cir. 2008).

Furthermore, even if Plaintiffs were aware that the Red Hat Society existed (which is not clear),

they were not on notice that this particular affiant, whom Defendant does not contend any of the

Plaintiffs have ever met or were aware of, would be offered as a witness in support of

Defendant's case.  *See Haas*, 2007 WL 766324, at *3 (significant prejudice shown where

opposing party did not even learn of witness's existence until non-disclosing party filed its

opposition to summary judgment).  As this case has been pending since 2010 and Defendant had

---

[8] Plaintiffs filed their Complaint on August 25, 2010, (Doc. 1), and Defendant did not file its Motion for Summary
Judgment until January 15, 2013, (Doc. 45).

ample time to disclose May's identity, further delay of this matter through a continuance is not warranted.

Accordingly, I will not consider the information contained in May's affirmation.

3. The Smith Affirmation[9]

Smith is the Benefits Administrator in Defendant's Human Resources ("HR") Department.  (Smith Aff. ¶ 3.)  Using Defendant's computer system, "HRIS," Smith could find information about Defendant's workforce, such as the number of employees, demographic information, job titles, and employment history.  (*Id.* ¶ 5.)  Smith generated this information and used it to testify to, among other things, the employees' average age, the number of employees terminated, the average age of employees who were laid off, and the number of employees in various departments who are members of the protected age group.[10]  (*Id.* ¶¶ 9-14.)  Smith also provided the age and birth date of certain employees.[11]  (*Id.* ¶ 15.)

Given the record before me, it does not appear that Plaintiffs would have been on notice of the potential use of Smith as a witness.  Defendant does not contend the Plaintiffs were aware of Smith or her role at the company, which is unsurprising considering that, allegedly, Defendant's own counsel did not even know Smith existed until preparing for summary

---

[9] Aside from Defendant's failure to disclose Smith as an individual likely to have discoverable information, Plaintiffs argue that her affirmation should be stricken from the record because she is improperly testifying as an expert witness.  (Ps' Mem. 8 (citing Fed. R. Evid. 702).)  In light of my disposition below, I need not reach whether her affirmation should be precluded on this basis.

[10] Forty is the minimum age protected by the ADEA.  *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003).

[11] Defendant should have redacted the day and month of each individuals' birth from the Smith Affirmation before filing it with the Court.  (*See* Smith Aff. ¶ 15.)  Its failure to do so violates Federal Rule of Civil Procedure 5.2(a)(2).  *See* Fed. R. Civ. Proc. 5.2(a)(2) ("[I]n an electronic or paper filing with the court that contains an individual's . . . birth date . . . the filing may include only . . . the year of the individual's birth.")  The same also should have been redacted from both Defendant's and Plaintiffs' Rule 56.1 Statements.  (*See* Defendant's Local Rule 56.1 Statement of Material Facts as to which there is No Genuine Issue to be Tried ("D's 56.1"), (Doc. 48), ¶ 8; Plaintiffs' Rule 56.1(b) Statement of Material Contested Facts ("Ps' 56.1"), (Doc. 51), ¶ 8.)  The parties are directed to file corrected documents on the Electronic Case Filing ("ECF") system within one week.  The Clerk of Court is directed to withdraw Docs. 48 and 51 and Exhibit P to Doc. 49.

judgment.  (D's Opp. 12.)  Plaintiffs should have been given an opportunity to depose Smith, and in her case, Defendant's non-disclosure cannot be classified as harmless.  *See Morgenstern*, 2008 WL 4449335, at *3 (non-disclosure was prejudicial where "[a]bsent disclosure, the Court [did] not see how Plaintiff could have anticipated the use of the [affiant], a person whose identity Plaintiff may not even have been aware of, and who did not play any role in the parties' discovery process").

Defendant contends that its failure to disclose Smith as an individual likely to have discoverable information was justified because its counsel was unaware she was the person who maintained the HRIS data system until preparing for summary judgment.  (D's Opp. 12.)  That counsel were as in the dark as Plaintiffs does nothing to mitigate the concerns that Rule 26 was designed to address, and counsel's lack of diligence does not excuse Rule 26 violations.  Indeed, counsel's failure to determine that Smith was a necessary witness is even less excusable than its failure to identify May, as Smith's affirmation goes to the heart of Defendant's case.  While I cannot say counsel acted in bad faith, they offer no excuse for their failure to disclose Smith.  In fact, their argument regarding Smith's information being work-product (with which I dispense in footnote eight above) suggests she was in fact known to counsel before the summary judgment motion was briefed.  If so, their actions might evidence bad faith.  If not, their actions remain unjustified.  Experienced employment-law counsel should have known that they would want to rely on a witness like Smith, and I cannot imagine why her identity was not disclosed (nor has Defendant explained why it was not).

Moreover, I do not find Smith's testimony to be of particular importance to Defendant, as Defendant itself contends that her testimony is "largely duplicative of other evidence already on the record," and all of the documents necessary to calculate the averages contained in the

affirmation were already disclosed.  (*See* D's Opp. 11-12 (citing *LaVigna*, 736 F. Supp. 2d at 512).)  For that same reason, and because this case has been pending since 2010, I decline to grant a continuance.

Accordingly, Plaintiffs' Motion to Strike is granted as to Smith's Affirmation.

## II.  <u>Background</u>

The following facts are set forth based on the parties' Local Civil Rule 56.1 statements and supporting materials, and are undisputed except where noted.  In light of the number of disputed facts, however, I recount here only the most basic facts, and I will address the more contentious facts in Section III below.

Defendant is a cosmetics manufacturer located in Port Jervis, New York.  (Ps' 56.1 ¶ 1.) In or about 2007, Defendant began to experience financial difficulties, and by 2009, Defendant was not meeting its financial projections.  (*Id.* ¶ 63; Massen MSJ Aff. Ex. A ("Bloomer Dep."), at 30-31.)  As a result, production, shipping, product development, overtime, and hiring all slowed.  (Ps' 56.1 ¶ 64.)  Defendant's management initially considered closing the Port Jervis facility, but instead decided to undergo cutbacks and layoffs.  (*Id.* ¶ 65; Massen MSJ Aff. Ex. B ("Cafiero Dep."), at 91-93.)  At that time, Defendant's directors submitted the names of employees nominated for layoff to Rob Theroux, Defendant's President and Chief Executive Officer, and Bill Matos, Vice President of HR.   (Ps' 56.1 ¶ 66; Massen MSJ Aff. Ex. D ("Matos Dep."), at 20-21.)  Theroux then met with each director and decided which employees would be laid off.  (Ps' 56.1 ¶ 66.)

Defendant has a Seniority Policy and a Layoff and Recall Policy.  (Ps' 56.1 ¶ 18.)  The Layoff and Recall Policy provides that it makes "every effort to lay off temporary and

introductory employees first."  (*Id.* ¶ 20; Massen MSJ Aff. Ex. BB.)  If further layoffs are

necessary, it instructs that they proceed in the following fashion:

- An employee having the least company seniority in the lowest level of the affected job classification within the department [will be selected for layoff];

- The employee having the least company seniority in the lowest level of the affected job classification will be permitted to exercise their seniority against an employee with less seniority in the operation.  When exercising seniority over lower seniority employees, attendance, performance, evaluations, training, skills, past experience and ability to perform essential functions of the position will be evaluated.

- Employees scheduled to be laid off may exercise their seniority on a shift other than their own within their job classification in their department.  Exceptions may be considered if previous experience is applicable.

(Ps' 56.1 ¶ 20; Massen MSJ Aff. Ex. BB.)  When an employee in a higher classification chooses

to take a less senior employee's position, this is known as "bumping."  (Ps' 56.1 ¶ 26.)  The

parties dispute whether bumping applies to both exempt and non-exempt employees and whether

bumping was in effect for the 2009 layoffs.  (*Id.* ¶¶ 26-27.)

### A. *Preuss*

Preuss was born in 1948 and began working for Defendant in 1970 as a packaging

mechanic.  (*Id.* ¶ 51; Ps' Opp. 1.)  Preuss received several merit increases and promotions while

employed by Defendant, and became a Plant Engineer by November 1989.  (Ps' 56.1 ¶ 54;

Gelman MSJ Decl. Ex. 16.)[12]  As Director of Operations, Luckey was Preuss's supervisor.  (Ps'

56.1 ¶¶ 4-5.)

In April 2009, Theroux informed Luckey that he needed to lay off some of his

employees.  (Ps' 56.1 ¶ 106; *see* Massen MSJ Aff. Ex. E ("Luckey Dep."), at 61-62.)  Luckey

met with Preuss and Pierette Valentia, an HR employee, in May 2009, and told Preuss that he

would be laid off because "the plant was slowing down and there was a loss of business."  (Ps'

---

[12] "Gelman MSJ Decl." refers to the Declaration of Phyllis Gelman in Opposition to Summary Judgment, with the Exhibits of Plaintiffs.  (Doc. 52.)

56.1 ¶ 107; Massen MSJ Aff. Ex. C ("Preuss Dep."), at 112.)[13]  Defendant offered Preuss severance, but Preuss declined because Defendant's severance policy required him to waive and release any claims he may have had against Defendant.  (Ds' 56.1 ¶ 114; Ps' 56.1 ¶ 114; Preuss Dep. 112-13.)

### B.  *Bloomer*

Bloomer, who was born in 1945, was hired by Defendant in March 1964 as a Stock Clerk.  (Ps' 56.1 ¶ 33.)  From 1982 until early 2009, Bloomer was employed as an "Outbound Stock Clerk A" in the K-3 area of the warehouse, and his responsibilities included verifying load slips for finished goods production, stocking finished goods, pulling finished goods for shipment, and loading trucks.  (*Id.* ¶ 34; Gelman MSJ Decl. Ex. 23; D's 56.1 ¶ 83.)

In early 2009, Bloomer was selected for layoff.  (Ps' 56.1 ¶ 82.)  Defendant contends that at that time, Bloomer's supervisors, Baker and Dussinger, offered him the first choice of four open positions in the Warehouse-Logistics Department, but Bloomer declined all four positions. (D's 56.1 ¶¶ 85-86; Dussinger Aff. ¶ 13.)  Although the parties dispute the circumstances surrounding Bloomer's transfer, he eventually decided to accept a position in the K-4 area of the warehouse.  (*See* D's 56.1 ¶¶ 87-88; Dussinger Aff. ¶ 14; Bloomer Dep. 50-56, 69-71.)

When Bloomer was transferred, Baker was assigned to train him how to use Defendant's computer system, which he had not used in his prior position.  (D's 56.1 ¶¶ 89, 92; Ps' 56.1 ¶ 92.)  Bloomer had some difficulty learning the computer system and wanted more time to train, (*see* Bloomer Dep. 52, 54), so Cathy Ewanicw, a K-3 warehouse employee, Dussinger, Matos, and Valentia attempted to have Bloomer transferred to Ewanicw's department for further training, (Ps' 56.1 ¶ 94; Massen MSJ Aff. Ex. G ("Ewanicw Dep."), at 35-37).  Tom Drennan,

---

[13] The parties dispute why Preuss was selected for layoff, which will be discussed below.  (*See* Ds' 56.1 ¶¶ 107-13; Ps' 56.1 ¶¶ 107-13.)

Ewanicw's and Dussinger's supervisor, did not approve the transfer.  (Ps' 56.1 ¶ 95; Ewanicw

Dep. 37.)

Bloomer was laid off on May 27, 2009, although the parties dispute whether Bloomer

requested to be laid off or whether it was involuntary.  (Massen MSJ Aff. Ex. F ("Valentia

Dep."), at 78, 115; Bloomer Dep. 52-54, 57.)  The following day, Luckey offered Bloomer a

position as a material handler in Defendant's lipstick department, which Bloomer declined.  (D's

56.1 ¶ 98; Ps' 56.1 ¶ 98.)  In November 2009, Bloomer was offered another job – this time as a

material handler in the powder department – but again he declined.  (Ps' 56.1 ¶ 99; Bloomer

Dep. 49, 57.)  In or around May 2010, Bloomer retired and informed Defendant's HR

department of the same.  (Bloomer Dep. 56, 71.)

## C.  Cafiero

Cafiero was born in 1959, and was hired by Defendant in January 2003 at the age of 43.

(Ps' 56.1 ¶¶ 43-44; Compl. ¶ 5.)  Cafiero was originally employed as a powder compounder, but

he quickly advanced, and by November 2007 he was promoted to Operations Manager of

Manufacturing.  (Ps' 56.1 ¶¶ 45-46; Ps' Opp. 1.)

Luckey selected Cafiero for layoff in June 2009, and his decision was approved by Matos

and Theroux.  (Ps' 56.1 ¶¶ 117-18.)  Defendant contends that Luckey chose Cafiero because his

responsibilities could be easily absorbed by another employee and because Cafiero had a history

of insubordination.  (D's 56.1 ¶¶ 119-20, 128-52.)

Despite Cafiero's alleged insubordination, Defendant recalled Cafiero in January 2010

and offered him employment as a Purchasing Agent.  (Ps' 56.1 ¶¶ 227-28.)   As a purchasing

agent, he was part of the procurement team for Elizabeth Arden, one of Defendant's clients.

(D's 56.1 ¶ 234; Ps' 56.1 ¶ 234.)  Defendant contends that in spring 2010, Dussinger learned that

Elizabeth Arden was unhappy with Cafiero's performance.  (Dussinger Aff. ¶ 27.)  Dussinger

scheduled a conference call with Elizabeth Arden on April 13, 2010 to discuss its concerns, in

which call Cafiero was supposed to participate.  (*Id.*; Ps' 56.1 ¶ 237.)  On the day of the call,

however, Cafiero did not report for work, though the parties dispute the reason for Cafiero's

absence.  (*See* Ds' 56.1 ¶¶ 238, 240-41 (Cafiero told Bock "he intended to avoid the conference

call"); Ps' 56.1 ¶ 235 ("Cafiero was absent from work because he was sick.").)  Defendant

alleges that after this incident, Matyus decided to terminate Cafiero because he believed that

Cafiero had intentionally missed the conference call.  (D's 56.1 ¶ 242.)  Defendant terminated

Cafiero on April 19, 2010.  (Ps' 56.1 ¶ 48.)

*        *        *

Plaintiffs now bring claims for age discrimination and retaliation under the Age

Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, ("ADEA") and the New

York State Human Rights Law, New York Executive Law § 296 *et seq.*, ("NYSHRL").  (*See*

Compl. ¶ 1.)

## III.  <u>Summary Judgment</u>

### A.  *Legal Standard*

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

16

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if

satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every

element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v.*

*Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the

motion, it "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R.

Civ. P. 56(c)(4); *see Major League Baseball Props.*, 542 F.3d at 310.  In the event that "a party

fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court

may," among other things, "consider the fact undisputed for purposes of the motion" or "grant

summary judgment if the motion and supporting materials – including the facts considered

undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

Although summary judgment should be used "sparingly" where the material issue concerns an employer's intent, motivation, or state of mind, "[a] plaintiff must nevertheless offer concrete evidence from which a reasonable juror could return a verdict in his favor . . . and is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (citation and internal quotation marks omitted). Moreover, summary judgment may be appropriate where the plaintiff has submitted only conclusory allegations of discrimination. *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

B. *Analysis*

1. Age Discrimination

The ADEA and the NYSHRL prohibit discrimination in employment on the basis of age. *See* 29 U.S.C. § 623(a)(1); N.Y. Exec. L. § 296(a)(1). Plaintiffs bring claims under both statutes alleging that they were subjected to a hostile work environment and that they faced disparate treatment based on their age. (Ps' Opp. 7, 14.)

a. Hostile Work Environment

To make out a *prima facie* case for hostile work environment, a plaintiff must show that he is a member of a protected class and that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment."[14] *Francis v. Elmsford Sch. Dist.*, 263 F. App'x 175, 177 (2d Cir. 2008) (summary order) (internal quotation marks omitted). Furthermore, "there must be a specific basis for imputing the conduct creating the hostile work environment to the employer." *Doner-*

---

[14] ADEA and NYSHRL claims for hostile work environment are analyzed under the same standards, and therefore I will not address Plaintiffs' NYSHRL claims separately. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013) ("Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard."); *Terry*, 336 F.3d at 148 (same standards apply to ADEA and Title VII hostile work environment claims).

*Hendrick v. N.Y. Inst. of Tech.*, No. 11-CV-121, 2011 WL 2652460, at *5 (S.D.N.Y. July 6, 2011) (internal quotation marks omitted).

A work environment is "hostile" if "a reasonable person would have found [the work environment] to be [hostile] and if the plaintiff subjectively so perceived it." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999). "To decide whether the [hostile work environment] threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002); *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) ("In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.") (internal quotation marks omitted). "Pervasive" harassment is harassment that is "more than episodic," and instead, "continuous and concerted." *Hayut*, 352 F.3d at 745. As the Supreme Court has stated, "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to establish a hostile work environment claim. *Harris*, 510 U.S. at 21 (first alteration in original) (citation and internal quotation marks omitted).

Although "a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of [his] employment *altered for the worse*." *Terry*, 336 F.3d at 148. (emphasis in original) (internal quotation marks omitted). "[T]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Feingold v. N.Y.*, 366 F.3d 138, 150 (2d Cir. 2004)

(internal quotation marks omitted).  Finally, a "plaintiff need not show that [his] hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered [his] working conditions."  *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 673 (S.D.N.Y. 2011) (emphases in original) (internal quotation marks omitted).

"[T]he Second Circuit has cautioned [that] the existence of a hostile work environment is a mixed question of law and fact.  These kinds of questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue."  *Hill v. Taconic Developmental Disabilities Servs. Office*, 181 F. Supp. 2d 303, 321 (S.D.N.Y. 2002) (citation and internal quotation marks omitted), *vacated on other grounds*, 57 F. App'x 9 (2d Cir. 2003).  Nevertheless, summary judgment is appropriate where the "evidence does not rise to the level of severity or pervasiveness needed to support a hostile work environment claim."  *Smith v. New Venture Gear, Inc.*, 319 F. App'x 52, 56 (2d Cir. 2009) (summary order).

Preuss and Cafiero allege that they were subjected to a hostile work environment because their supervisor, Luckey, harassed them and other employees based on their age.  (Ps' Opp. 7-14.)  Preuss alleges that Luckey constantly called him "old man" and on at least one occasion asked him when he was going to retire so that he could replace him with "young blood."  (Preuss Dep. 75.)  Preuss also contends that at a staff meeting, Luckey told him that "[he] hope[d] the swine flu virus comes through here and gets rid of you old timers."  (*Id.* at 76.)  When Preuss asked Luckey whether he was referring to him, Luckey allegedly replied, "Yes, you got that right."  (Cafiero Dep. 123-24.)  Cafiero alleges that frequently Luckey would yell at him and call him "useless, worthless, [and] incompetent," and approximately one to two times per month,

20

threaten to fire him "again and again," and call him "old man."  (*Id.* at 114-15, 118, 120.)

Plaintiffs also allege that Luckey would refer to older women in the lipstick department as the

"Red Hat Society," and comment that these women worked too slowly.  (Preuss Dep. 101.)

       Plaintiffs have sufficiently alleged the existence of a hostile work environment.  The

retirement and the swine flu comments certainly evidence age-based animus, and Plaintiffs

testified that Luckey called Preuss "old man" every day for a year, (*see* Preuss Dep. 91), and

Cafiero "old man" one to three times a month when he would threaten to fire him, (Cafiero Dep.

115, 118).   Even if some of the age-related remarks were directed at one Plaintiff or the other,

(*see* Ps' 56.1 ¶ 181), the comments were made publicly in front of employees other than the

target, and "a jury could plausibly find that [Luckey's] persistently offensive conduct created an

overall hostile or abusive environment," *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir.

2000) (internal quotation marks omitted).   "[E]vidence of harassment directed at other co-

workers can be relevant to an employee's own claim of hostile work environment

discrimination."  *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001); *see Cruz*,

202 F.3d at 570 (plaintiff who experiences harassment can rely on incidents directed toward

other targets to support claim); *Sebold v. City of Middletown*, No. 05-CV-1205, 2007 WL

2782527, at *11 (D. Conn. Sept. 21, 2007) (finding relevant plaintiff's testimony that "workplace

hostility was further amplified by [employee's] discriminatory and retaliatory conduct toward

other women"); *see also Leibovitz*, 252 F.3d at 190 (even comments outside plaintiff's presence

can be relevant to hostile work environment analysis if communicated to her).  Moreover, Preuss

contends that Luckey's comments made him feel "uncomfortable, targeted and ashamed," (Ps'

56.1 ¶ 184), and Cafiero testified that he was "horrified [and] appalled" by Luckey's comments

and that he had "hellish nightmares about the abuse [Luckey] put [him] through," (Cafiero Dep.

125, 130).   Further evidence of Preuss's subjective experience of his environment as hostile

comes from his complaints to management about his treatment of him.  (Ps' 56.1 ¶¶ 214, 217.)

Although no single incident may be severe enough in this case to constitute actionable conduct,

considering the evidence in its totality and in the light most favorable to Plaintiffs, I find that

they have provided sufficient evidence of "a series of incidents [that] were sufficiently

continuous and concerted to have altered the conditions of [the] working environment."  *Cruz*,

202 F.3d at 570 (internal quotation marks omitted); *see Pierce v. Gareb Shamus Enters., Inc.*,

No. 09-CV-1564, 2013 WL 1344963, at *7-*8 (E.D.N.Y. Mar. 29, 2013) (denying summary

judgment where plaintiff alleged defendant made "constant reference[s]" to his age, including

calling him "old guy," and telling him he was "too old to understand").

　　　　Because Plaintiffs have set forth facts sufficient to create an issue of fact as to a hostile

work environment, it is necessary to determine whether it is proper to impute liability to

Defendant.  An employer's liability for workplace harassment may depend on the status of the

harasser.  *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).[15]  "If the harassing

employee is the victim's co-worker, the employer is liable only if it was negligent in controlling

working conditions."  *Id.*  If, on the other hand, the harassing employee is the victim's

supervisor, "different rules apply."  *Id.*  The Supreme Court recently made clear that "an

employee is a 'supervisor' for purposes of vicarious liability under [a federal statute] if he . . . is

empowered by the employer to take tangible employment actions against the victim."  *Id.*  A

"tangible employment action" is defined as "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

---

[15] Although *Vance* was concerned with employer liability for a hostile work environment claim brought under 42
U.S.C. § 2000e ("Title VII"), there does not appear to be any reason to confine its holding to that statute alone.  As
Title VII and ADEA claims for hostile work environment are analyzed under the same standard in this Circuit, *see*
*Terry*, 336 F.3d at 148, I will apply *Vance*'s holding to employer liability under the ADEA.

decision causing a significant change in benefits." *Id.* at 2442 (internal quotation marks omitted).

Defendant contends that under the Supreme Court's holding in *Vance*, Luckey was not a "supervisor" because he could not take any tangible employment actions with respect to Plaintiffs. (Doc 63, at 2.) The parties do not dispute that Luckey's only role in Plaintiffs' termination was his recommendation to Theroux and Matos for their layoff. (*See* D's 56.1 ¶ 66; Ps' 56.1 ¶ 66.) What is in dispute, however, is whether such a recommendation is sufficient to constitute a "tangible employment action." *Vance*, 133 St. Ct. at 2439. Plaintiffs argue that his recommendation is sufficient because it was "'subject only to the ministerial approval of his supervisor, who merely signed the paperwork,'" (Doc. 64, at 2 (quoting *Vance*, 133 S. Ct. at 2446)), and I agree. Although Theroux was the ultimate decisionmaker, Luckey presented Theroux with recommendations, and Theroux approved every recommendation without asking Luckey any questions about the specific employee recommended. (Luckey Dep. 93-95.) In holding that the ability to take a "tangible employment action" was necessary to confer supervisory status on an employee, the Supreme Court assumed that such an employment action "can be subject to such approval by higher management." *Vance*, 133 S. Ct. at 2446 n.8.

Accordingly, while Luckey's supervisory status may ultimately be an issue for the jury to resolve, Plaintiffs have sufficiently alleged a claim for hostile work environment under the ADEA and the NYSHRL for which Defendant may be held liable.

     b.  <u>Disparate Treatment</u>

Plaintiffs' claims for disparate treatment are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its

progeny.[16]  The plaintiff must first establish a *prima facie* case, which gives rise to a presumption

of discrimination.  *See Terry*, 336 F.3d at 137-38.  If the plaintiff makes out a *prima facie* case,

the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for

the adverse action.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant makes such a

showing, the burden shifts back to the plaintiff to demonstrate that the articulated justification is

in fact a pretext for discrimination.  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.

2000). To satisfy its burden at the final stage, the plaintiff must show that age discrimination was

the "but-for" cause of the adverse action, and not merely one of the motivating factors.  *Gross*,

557 U.S. at 180; *see Gorzynski*, 596 F.3d at 106.  In determining whether the plaintiff has

satisfied this burden, the Court must consider the sum of all evidence of discrimination "in its

totality, rather than examining specific aspects of evidence in isolation."  *Ellenbogen v.

Projection Video Servs., Inc.*, No. 99-CV-11046, 2001 WL 736774, at *8 (S.D.N.Y. June 29,

2001) (citing *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2000)).

       i.   *Prima Facie* Case

     To make out a *prima facie* case of age discrimination, a plaintiff must show that:  (1) he

is a member of a protected age group; (2) he is qualified to perform the job in question; (3) he

was discharged; and (4) the discharge occurred under circumstances giving rise to an inference

of discrimination based on membership in the protected class.  *See Slattery v. Swiss Reinsurance

Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.

2000); *Mattera*, 740 F. Supp. 2d at 571.  For the purposes of this motion, Defendant only

---

[16] This framework applies to ADEA and NYSHRL claims.  *See, e.g.*, *Dixon v. Int'l Fed'n of Accountants*, 416 F.
App'x 107, 109 (2d Cir. 2011) (summary order) (applying framework to ADEA and NYSHRL claims); *see also
Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (notwithstanding Supreme Court's decision in
*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), this Circuit has continued to apply *McDonnell Douglas* burden-
shifting framework to ADEA claims); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 570–71 (S.D.N.Y.
2010) (applying *McDonnell Douglas* burden-shifting framework to ADEA claims after *Gross*).

challenges the fourth requirement, and argues that Plaintiffs have not made out a *prima facie* case because they have offered no evidence, direct or circumstantial, suggesting that the decision to layoff Plaintiffs was because of discriminatory animus.  (D's Mem. 5.)

In determining whether the evidence adduced gives rise to an inference of age discrimination, it is generally sufficient to demonstrate that the plaintiff was passed over for a candidate "substantially younger" than the plaintiff.  *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 187 (2d Cir. 2006); *see Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice" to establish the required inference of discrimination.).[17]  In a reduction-in-force case, however, the inquiry is whether there is "evidence that an employer fired qualified older employees but retained younger ones in similar positions."  *Burger v. N.Y. Inst. of Tech.*, 94 F.3d 830, 834 (2d Cir. 1996) (alteration and internal quotation marks omitted).

Plaintiffs contend that they have satisfied their burden because each was laid off and their responsibilities were assumed by younger employees in similar or identical positions for which Plaintiffs would have been qualified.  (Ps' Opp. 16.)  Defendant argues in essence that Plaintiffs' positions were eliminated and their layoffs logically followed that elimination, (D's Mem. 7-9), but the case is not that clear-cut.

---

[17] Defendant contends that even if an employee is terminated and replaced by a younger worker, that fact is insufficient, by itself, to defeat a motion for summary judgment, and therefore Plaintiffs cannot establish a *prima facie* case.  (D's Mem. 5-6.)  Defendant is correct that replacement by a younger worker, standing alone, is insufficient to show pretext, (s*ee Farina v. Branford Bd. of Educ.*, No. 09-CV-49, 2010 WL 3829160, at *6 (D. Conn. Sept. 23, 2010) (replacement by someone outside class is not sufficient to show pretext), *aff'd*, 458 F. App'x 13 (2d Cir. 2011) (summary order); *O'Sullivan v. N.Y. Times*, 37 F. Supp. 2d 307, 319 (S.D.N.Y. 1999) (same)), but replacement by someone outside of the protected class generally suffices for purposes of the *prima facie* case to establish the discharge occurred under circumstances giving rise to an inference of discrimination, *see Zimmerman*, 251 F.3d at 381.

aa. <u>Bloomer</u>

Plaintiffs assert that Bloomer was the oldest employee in his classification, he was the only one laid off, and a significantly younger employee, Kelly Barton, absorbed his duties.  (Ps' Opp. 16.)  Defendant contends that because the warehouse did not have enough work for two "Outbound Stock Clerk A" positions, Bloomer was selected for lay off.  (D's 56.1 ¶ 83.) Defendant concedes that Barton, a 31-year-old, remained in place as the sole Outbound Stock Clerk A.  (*Id.* ¶ 102.)  Defendant has not offered any explanation as to why Bloomer was selected for layoff rather than Barton, and a trier of fact could find that in a decision between the two, Bloomer's age was the deciding factor.  *See Windham v. Time Warner, Inc.*, 275 F.3d 179, 188 (2d Cir. 2001) (inference of discrimination where defendant retained a duplicate job to plaintiff's, plaintiff was qualified, yet plaintiff was terminated and employee outside protected class was retained); *Blake v. Bronx Lebanon Hosp. Ctr.*, No 02-CV-3827, 2007 WL 2981465, at *9 (S.D.N.Y. Oct. 10, 2007) (black plaintiff established inference of discrimination where duties were reassigned to white employee after reduction in force); *Simpson v. Vacco*, No. 96-CV-3916, 1998 WL 118155, at *6 (S.D.N.Y. Mar. 17, 1998) (same), *reconsideration denied in relevant part*, 1998 WL 264850 (S.D.N.Y. May 26, 1998).  Further, it is not clear why an Outbound Stock Clerk A position was eliminated at all, when two Outbound Stock Clerk B positions, which are more junior and were held by younger people, were retained.  This could suggest a desire to target the oldest worker.

As to Bloomer's second layoff on May 27, 2009, Plaintiffs have also established a *prima facie* case of age discrimination.  Defendant does not contend the layoff occurred as part of its reduction-in-force, but rather that Bloomer requested to be laid off because he had difficulty learning the computer system.  (D's 56.1 ¶¶ 93, 96.)  Bloomer, in contrast, testified that he was

"shocked" and "had no warning" that he was going to be laid off.  (Bloomer Dep. 52.)  Because the reduction-in-force analysis is not implicated here, in determining whether the evidence adduced gives rise to an inference of age discrimination, it is sufficient for Plaintiffs to demonstrate that Bloomer was replaced by a candidate "'substantially younger'" than the plaintiff.  *Rouse v. City of N.Y.*, No. 08-CV-7419, 2009 WL 1532054, at *6 (S.D.N.Y. June 2, 2009) (quoting *Graves*, 457 F.3d at 187).  Plaintiffs easily satisfy that burden here, as Rasoul Speight, an employee in his twenties, replaced Bloomer.  (D's 56.1 ¶ 103.)

    bb. Cafiero

   Plaintiffs allege that in June 2009, Cafiero was one of two Operations Managers in his department; Defendant chose to retain the younger manager and lay off Cafiero; and Paul Heilfurth, a younger, more junior employee, absorbed a significant portion of Cafiero's responsibilities.[18]  (Ps' Opp. 16.)  Defendant contends that Cafiero was laid off because his position was eliminated, (D's Mem. 9), but after his layoff, his responsibilities were absorbed by two younger employees, Jeff Swaine and Heilfurth,[19] (Ps' 56.1 ¶ 123; Ps' Opp. 16).  The record is not particularly clear as to what portion of Cafiero's responsibilities was related to Heilfurth's work or whether Cafiero would have been qualified to assume Heilfurth's responsibilities, particularly because Heilfurth, Cafiero's subordinate, absorbed approximately forty percent of

---

[18] In their Complaint, Plaintiffs also contend that Cafiero's April 2010 termination was based on age.  (Compl. ¶ 40 ("Kolmar's second termination of Cafiero was due to his age (50) and in retaliation for his having complained of age-based discrimination and harassment.").)  Plaintiffs, however, have offered no evidence to support that his April 2010 termination was based on his age, and do not address Defendant's argument in its Motion for Summary Judgment that Cafiero's age discrimination claim arising out of his second termination should be dismissed, and thus it can be dismissed on that basis alone.  *See Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases).  In any event, as Plaintiffs seem to concede, the allegations concerning Cafiero's April 2010 termination more properly support a claim for retaliation under the ADEA and the NYSHRL.  (Ps' 56.1 ¶ 48 ("[Cafiero] was fired by Kolmar in retaliation for filing a complaint of age discrimination . . . .").)

[19] Plaintiffs do not contend that Cafiero should have been retained instead of Swaine, as Swaine was Cafiero's supervisor.  (Ps' Opp. 19.)

Cafiero's work.  (Massen MSJ Aff. Ex. H ("Heilfurth Dep."), at 76; Ps' Opp. 16.)  It may be the

case that a substantial part of Cafiero's duties were not in fact eliminated, but rather were

transferred to Swaine and Heilfurth, which could suggest an inference of discrimination.  *See*

*Burger*, 94 F.3d at 834 (inference of discrimination where plaintiff presented evidence that "a

substantial portion of the duties that she performed were not eliminated and, inferentially, were

transferred to younger employees") (alterations and internal quotation marks omitted); *Fratturo*

*v. Gartner, Inc.*, No. 11-CV-113, 2013 WL 160375, at *8 (D. Conn. Jan. 15, 2013) (evidence

that plaintiff's duties were reassigned to younger employees after her termination sufficient to

establish inference of discrimination); *cf. Vaughn v. Mobil Oil Corp.*, 708 F. Supp. 595, 600-01

(S.D.N.Y. 1989) (inference of discrimination may arise when employer locates new positions for

younger, but not older, workers in implementing reorganization).  Thus, Plaintiffs have adduced

evidence sufficient to establish a *prima facie* case of age discrimination.  That Cafiero was later

recalled may undermine the strength of the inference, but it does not eliminate it, especially in

light of Luckey's role in his layoff, (Ps' 56.1 ¶ 118), but not, apparently, his recall, (*id.* ¶ 227).

       cc. <u>Preuss</u>

      Finally, Plaintiffs contend that Preuss's duties were divided between two younger, less

senior employees, Alan DeGarmo and Dane Wagner, one of whom had reported to Preuss in his

capacity as Plant Engineer.[20]  (Ps' Opp. 16.)  As with Cafiero, the record is unclear as to what

---

[20] Defendant argues that its retention of Wagner rather than Preuss cannot be considered on summary judgment
because Plaintiffs' Complaint does not contain any allegations specifically involving Wagner.  (Defendant Kolmar
Laboratories, Inc.'s Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment ("D's
Reply"), (Doc. 53), 2.)  "Although a complaint need not correctly plead every legal theory supporting the claim, at
the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate
defense."  *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (internal citations omitted).  Here,
Plaintiffs' allegation that Defendant discriminated against him and replaced him with DeGarmo was sufficient to put
Defendant on notice that Preuss would be pursuing an age discrimination claim and that the post-layoff distribution
of his responsibilities would be in issue.  (*See, e.g.*, Luckey Dep. 97-99 (discussing Wagner).)  Plaintiffs may not
have known until discovery commenced that Preuss was replaced by both DeGarmo and Wagner, and in light of the
substantial discovery undertaken in this case – indeed, the parties submitted 130 exhibits (one of which is Wagner's

portion of Preuss's responsibilities was related to Wagner's and DeGarmo's work or whether Preuss would have been qualified to assume their responsibilities.  Defendant may have transferred a substantial part of Preuss's duties to Wagner and DeGarmo rather than eliminate his role entirely, which could suggest Preuss was the employee selected for layoff because of his age.  *See Burger*, 94 F.3d at 834; *Fratturo*, 2013 WL 160375, at *8; *Vaughn*, 708 F. Supp. at 600-01.  Indeed, Wagner's statement that the overlap between his and Preuss's responsibilities helped make for a "smooth and easy transition," (Massen MSJ Aff. Ex. O, ¶ 6), could suggest that a layoff decision involved a choice among Preuss and Wagner.  The evidence adduced is sufficient to allow – though not compel – the trier of fact to find that "the pertinent decision was a choice of which person to lay off and not simply which job to eliminate."  *Burger*, 94 F.3d at 834.  Accordingly, Preuss has established a *prima facie* case of age discrimination.

Further, Preuss has offered direct evidence of Luckey's ageist animus – such as asking Preuss when he would retire so that he could replace him with "young blood," (Preuss Dep. 75.) – which alone suffices, given Luckey's influence in deciding who would be laid off, *see Holcomb*, 521 F.3d at 143 (sufficient for plaintiff to demonstrate that individual with impermissible bias played "meaningful role" in decision to terminate), to support an inference of discrimination.

ii.   Legitimate, Non-Discriminatory Reason

Because Plaintiffs have established a *prima facie* case of age discrimination, the burden shifts to Defendant to set forth a legitimate, non-discriminatory reason for Plaintiffs' layoffs.  *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (employer's obligation at second step of *McDonnell Douglas* test is to articulate a reason for termination that, if believed,

---

affirmation) in connection with the motion for summary judgment alone –Defendant has not been prejudiced, and I will consider Plaintiffs' allegation regarding Wagner.

would support finding that unlawful discrimination was not the reason for the adverse employment action). "This burden has been described as light, and courts have held that the employer need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 176 (E.D.N.Y. 2011) (internal citation and quotation marks omitted).

Defendant primarily contends that Plaintiffs were laid off because it was undergoing financial difficulties and a reduction-in-force was necessary.  (D's Mem. 10-11.)  Defendant also offers specific reasons for its decision to lay off each Plaintiff.  Plaintiffs do not dispute that any of Defendant's proffered reasons are illegitimate, arguing only that they are pretextual.

aa. <u>Bloomer</u>

As to Bloomer's first layoff, Defendant alleges that because he was working in a department that only generated twenty percent of the company's work, his responsibilities could easily be absorbed by Barton, and thus his position was eliminated.  (*Id.* at 11.)  Defendant has articulated a legitimate business reason for eliminating Bloomer's role.  *See Penberg*, 823 F. Supp. 2d at 176 ("economically-driven restructuring" is legitimate, non-discriminatory reason for termination) (collecting cases).  Regarding Bloomer's May 2009 layoff, Defendant alleges that Bloomer requested to be laid off after he had difficulties with Defendant's computer system and thus Defendant discharged him from his position, also a legitimate, non-discriminatory rationale. (*Id.* at 12.)

bb. <u>Cafiero</u>

Regarding Cafiero, Defendant asserts that after the company consolidated, it realized that Cafiero's responsibilities could be absorbed by Swaine.  (*Id.* at 13.)  Defendant further contends

that Cafiero's alleged insubordinate behavior influenced its decision to select him for layoff.[21]

(*Id.* at 13-14.)  Defendant has submitted evidence in the form of affidavits and depositions to

support its proffered reasons, and Cafiero does not dispute that some of the instances of

perceived insubordination occurred.  (*See* Cafiero Dep. 134-41.)  Defendant's reasons, if "taken

as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse

action."  *Schnabel v. Abramson*, 232 F.3d 83, 87-88 (2d Cir. 2000) (defendant satisfied burden

by citing plaintiff's insubordination and difficulty following instruction); *see Sklar v. N.Y. Life*

*Ins. Co.*, 34 F. App'x 403, 405 (2d Cir. 2002) (summary order) (plaintiff's disrespect for

supervisors legitimate, non-discriminatory reason for termination); *Del Franco v. N.Y.C. Off-*

*Track Betting Corp.*, 429 F. Supp. 2d 529, 538-39 (E.D.N.Y. 2006) (allegations of misconduct

and insubordination legitimate, non-discriminatory reason for discharge).

cc. <u>Preuss</u>

Finally, Defendant contends that Preuss, an employee in the Engineering Department,

was laid off when the Engineering Department and Facilities Department were consolidated.

(D's Mem. 12.)  Because Defendant believed Wagner could easily absorb Preuss's duties, Preuss

was the employee selected for layoff.  (*Id.*)  Defendant further alleges that Preuss's complaints

about his workload and his outspoken desire to be laid off contributed to its decision.  (*Id.* at 13.)

Thus, Defendant has articulated legitimate, non-discriminatory reasons for Preuss's layoff.  *See*

*Penberg*, 823 F. Supp. 2d at 176; *Barbano v. Madison Cnty.*, No. 82-CV-1160, 1988 WL 96581,

---

[21] Defendant contends that Cafiero engaged in several instances of insubordination in the weeks prior to his layoff. (D's Mem. 13.)  First, Defendant alleges that Luckey asked Cafiero to select employees from his department for layoff, and Cafiero did not abide by Defendant's seniority and layoff policies when he made his selections.  (*Id.*) When Luckey and Valentia met with him to discuss the issue and asked him to take Defendant's policies into account, Defendant contends that Cafiero refused to follow Defendant's policies and threatened to terminate an employee in contravention of the policies.  (*Id.*)  In addition, Defendant alleges that Cafiero acted inappropriately on a telephone call with another employee, Brandy Howard-Hart, and Howard-Hart asked Luckey and Matos to address the situation.  (*Id.* at 14.)  When Cafiero's supervisors spoke with him, Defendant alleges he acted defiantly and refused to acknowledge any wrongdoing.  (*Id.*)  Defendant asserts that Howard-Hart requested that Cafiero be terminated, but Luckey and Matos intervened.  (*Id.*)

at *6 (N.D.N.Y. Sept. 14, 1988).  Preuss denies complaining any more than anyone else or

asking to be laid off, but at the second step of the *McDonnell Douglas* analysis, a Defendant

need only articulate reasons that, *if believed*, would connote lawful behavior.  *See, e.g.*, *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

### iii.  Pretext

Where, as here, the employer has articulated a legitimate, non-discriminatory rationale,

Plaintiffs can no longer rest on their *prima facie* case, but must instead demonstrate that

Defendant's proffered non-discriminatory reason was pretextual.  *Weinstock*, 224 F.3d at 42.

Plaintiffs must "raise[ ] sufficient evidence upon which a reasonable jury could conclude by a

preponderance of the evidence that [their] age was a 'but for' cause of [Defendant's] decision."[22]

*Gorzynski*, 596 F.3d at 107.  Plaintiffs offer three reasons why Defendant's proffered

explanations for Plaintiffs' layoffs are pretextual:  (1) Defendant failed to follow its internal

Seniority and Layoff and Recall policies (the "policies") when conducting layoffs; (2) Plaintiffs'

supervisors displayed age-based animus; and (3) Defendant's reasons are shifting and

contradictory.  (Ps' Opp. 17-28.)

An issue of material fact exists as to whether Defendant followed its layoff and seniority

policies while conducting Plaintiffs' layoffs, and such a failure could be sufficient to demonstrate

---

[22] Defendant contends that because Plaintiffs have conceded that Defendant's financial situation played some part in its layoff decisions, Plaintiffs cannot prove age was the but-for reason for their discharge.  (D's Mem. 15.) Defendant's argument is unavailing.  Even if there is no dispute that some people had to be laid off, the issue in this case centers on whether the selection of Plaintiffs to be fired in the downsizing was based on an impermissible ground – or, put differently, whether Plaintiffs' age was the but-for reason they were selected for layoff.  Plaintiffs do not have to show that discrimination was the but-for cause of the downsizing itself.  Plaintiffs' admission that their layoffs took place in the context of downsizing does not justify summary judgment for Defendant, as the ADEA "makes no mention of any requirement that a plaintiff must be replaced in order to give rise to a cause of action."  *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998) (noting reduction-in-force cases are common in federal courts and issue focuses on whether selection of discharged employees was influenced by impermissible ground).  Age discrimination claims may be made in downsizing cases where, as here, there is sufficient evidence "that the pertinent decision was a choice of which person to lay off and not simply which job to eliminate."  *Burger*, 94 F.3d at 834.

that Defendant's proffered reasons for Plaintiffs' layoffs were pretextual.  *See Weinstock*, 224

F.3d at 45 ("Departures from procedural regularity . . . *can* raise a question as to the good faith of

the process where the departure may reasonably affect the decision.") (emphasis in original)

(alteration and internal quotation marks omitted); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d

1235, 1239-40 (2d Cir. 1995) (evidence defendant violated its reduction-in-force policy relevant

to establishing pretext); *Verdell v. Wilson*, 602 F. Supp. 1427, 1439 (E.D.N.Y. 1985) ("Failure to

follow guidelines may be viewed as evidence of pretext.").

Defendant contends that although it makes "every effort" to follow the guidelines of its

policies, decisions are ultimately made "consistent with business demands of [its] operations and

the requirements of [its] customers," and thus seniority is not always honored.  (D's 56.1 ¶¶ 20-

21, 25; Massen MSJ Aff. Ex. BB.)  Plaintiffs do not dispute that criteria other than seniority were

evaluated when selecting individuals for layoff, but argue that each of them were selected

because of their age, as similar or identical positions remained in existence for which Plaintiffs

would have been qualified.  (Ps' Opp. 16; Ps' 56.1 ¶ 79.)

aa. <u>Bloomer</u>

As stated above, Defendant eliminated one of the two Outbound Stock Clerk A positions,

but chose to layoff Bloomer, the older, more senior employee.  (Ps' Opp. 16; D's 56.1 ¶¶ 83,

102.)  Plaintiffs further allege that when Bloomer was laid off, Defendant employed two

individuals as an "Outbound Stock Clerk B," a position junior to Bloomer's.  (Ps' Opp. 19.)

Plaintiffs contend that consistent with Defendant's policies, the Outbound Stock Clerk B

positions should have been eliminated first, as those employees had "the least company seniority

in the lowest level of the affected job classification within the department."  (*Id.*; Massen MSJ

Aff. Ex. BB.)  Accordingly, Katrina Lein, a 39 year-old with only four years of seniority –

compared to Bloomer's forty-five years of seniority – should have been laid off first.  (Ps' Opp. 19.)

Defendant contends that a third employee, Speight, was actually the most junior employee, and therefore if Bloomer was going to "bump" anyone, it should have been him.  (D's Reply 5.)  Bloomer, however, is not arguing that he should have been allowed to bump these employees; rather, he alleges that one of the Outbound Stock Clerk B positions should have been eliminated before an Outbound Stock Clerk A, which Defendant fails to address. [23]  Thus, a material issue of fact exists regarding why Bloomer selected for layoff.

---

[23] Regarding Bloomer's later May 2009 layoff, the issue in dispute is not whether Defendant followed its internal policies, but rather whether Bloomer requested the layoff.  As Defendant has not offered any reason for Bloomer's layoff other than his alleged request and Bloomer testified that he was "shocked" when Defendant made the decision to lay him off, an issue of material fact exists that must be presented to the jury. *See Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (district court "should not weigh evidence or assess the credibility of witnesses" in reviewing motion for summary judgment).

In any event, it is likely that Bloomer will have a hard time convincing a jury that his May 2009 layoff was based on age discrimination, as Plaintiffs have not offered any convincing facts in support of this allegation.  Plaintiffs allege that Drennan's refusal to allow Bloomer to transfer to Ewanicw's department for additional computer training and his statement that Bloomer was "worthless" demonstrate Drennan's age-based animus.  (Ps' Opp. 23-24 ("[A] reasonable trier of fact could find that when Drennan called Bloomer 'worthless' and said 'he cannot do it[,]' he meant that Bloomer was too old to learn a computer system.").)  Plaintiffs, however, have offered no evidence in support of that assertion other than their speculative, subjective interpretation.  Moreover, a facially neutral statement is generally insufficient to demonstrate pretext.  *See Taylor v. Potter*, No. 99-CV-4941, 2004 WL 1811423, at *16 (S.D.N.Y. Aug. 16, 2004) (calling employees "worthless pieces of shit" and a "useless piece of shit" is facially neutral and not sufficient to demonstrate pretext of racial discrimination).  Further, Plaintiffs have not linked Drennan's remarks to Bloomer's layoff other than to allege that they happened the same day.

Additionally, the fact that Bloomer was offered not one, but two positions after he was laid off – one the following day, May 28, 2009, and the other in November 2009 – both of which *he* declined, negates an inference of discrimination.  Even more troublesome for Bloomer is that he has repeatedly offered contradictory explanations as to why he refused the two positions.  In his deposition, Bloomer testified that he rejected the May 28, 2009 offer because he did not want to bump a junior employee.  (Bloomer Dep. 72.)  After his deposition, Bloomer "corrected" his testimony and said he did not accept the position because it was a demotion.  (Ps' 56.1 ¶ 98.)  In Plaintiffs' 56.1 statement, however, Plaintiffs again allege that "rather than engineer the layoff of another employee," Bloomer decided to reject the May 28 employment offer.  (*Id.* ¶ 96.)  Bloomer offers similar shifting explanations for his rejection of the November 2009 offer.  He testified several times in his deposition that he refused the offer because he had already decided to go on social security and thus would not return to work, (Bloomer Dep. 54-55, 57), but "corrected" his testimony following the deposition to state that he refused because the position was a demotion, (Ps' 56.1 ¶ 99).  For neither position have Plaintiffs offered any evidence, other than their own unsupported assertions, that the positions were actually demotions.  And the seemingly wholesale changes to the depositions "obviously may affect the trier of fact's view of the credibility of the witness."  *Toland v. Forrest Labs, Inc.*, No. 00-CV-4179, 2001 WL 30617, at *1 (S.D.N.Y. Jan. 11, 2001).

bb. Cafiero

Regarding Cafiero, Plaintiffs allege that if Defendant abided by its policies, Heilfurth, who reported directly to Cafiero and had less seniority, should have been laid off first.[24]  (Ps' Opp. 20.)  Defendant does not dispute this allegation, except to say that its layoff policies did not apply to exempt employees such as Cafiero.  (D's Mem. 9.)  The parties dispute whether Defendant's "bumping" policy applies to both exempt and non-exempt employees.  (*Compare* D's 56.1 ¶ 26 *with* Ps' 56.1 ¶ 26.)  Although Defendant contends that its layoff policies do not apply to exempt employees, Luckey testified that it could apply to both employee classifications, and nothing in the policy itself indicates that it only applies to non-exempt employees.  (Luckey Dep. 69-70; *see* Massen MSJ Aff. Ex. BB.)  Defendant further alleges that in any event, bumping was not in effect for the 2009 layoffs, (D's 56.1 ¶ 27; D's Reply 4), but that is directly contradicted by the fact that Defendant offered Bloomer the opportunity to bump junior employees and Defendant's contention that Bloomer did indeed bump Speight, (D's 56.1 ¶¶ 87-88).  Thus, an issue of material fact exists regarding whether Cafiero was eligible for "bumping," and if so, why he was not given the opportunity to bump a less senior employee such as Heilfurth.  Accordingly, a material issue of fact exists regarding whether Defendant's reasons for Cafiero's layoff were pretextual.[25]

---

[24] Plaintiffs also contend that Liam Jablesnik, who was thirty-two years old and had worked for Defendant three years less than Cafiero, should have been laid off prior to Cafiero.  (Ps' Opp. 16, 19-20.)  Both Cafiero and Jablesnik were managers in the Department of Operations, but the former was Operations Manager of Manufacturing and the latter was Operations Manager of Assembly.  (*Id.* at 20.)  Plaintiffs contend that despite the difference in title, if Defendant needed to eliminate an Operations Manager, Jablesnik should have been laid off first pursuant to Defendant's policies.  (*Id.*)  At trial, Plaintiffs may have a difficult time convincing the jury that these two positions were in the same "job classification," and thus implicated Defendant's policies.  (*See* Luckey Dep. 95 ("Frank was the [operations] manager of manufacturing, and Liam was the [operations] manager of assembly.  One made the juice, the other one filled the juice.").)

[25] Even if Cafiero was able to bump junior employees, it is likely that Cafiero will have a difficult time proving his case at trial in light of his history of insubordination – some of which he does not dispute – and, more significantly, the fact that Defendant recalled him for employment in January 2010.

35

cc. <u>Preuss</u>

Plaintiffs contend that Wagner should have been laid off instead of Preuss because Wagner had less seniority and Preuss was capable of absorbing Wagner's duties, particularly because their responsibilities overlapped.  (Ps' Opp. 20; *see* Massen MSJ Aff. Ex. O, ¶ 6.) Defendant's first argument, of which I disposed above, (*see* note 20 above), is that any allegations concerning Wagner cannot be considered by the Court because they were not contained in Plaintiffs' complaint, (D's Reply 2).  Defendant further alleges that as an exempt employee, Preuss was not entitled to protection under its policies, which remains an issue of material fact to be determined at trial.  (*Id.* at 2-3.)  Finally, Defendant asserts that even if its policies applied to Preuss, he did not have an "absolute right" to replace employees with less seniority and thus his "deteriorating attitude" could be taken into account while making layoff determinations.  (*Id.* at 3.)  Preuss, however, disputes Defendant's characterization of his attitude, and specifically contends that the alleged "complaints" to Valentia – used as evidence of his negative demeanor – concerned Luckey's alleged age discrimination and were thus protected. (*See* D's 56.1 ¶ 56; Ps' 56.1 ¶ 56.)  Thus, a material issue of fact exists regarding whether Preuss's age was the but-for reason for his termination.

\*       \*       \*

In light of the above, I do not need to reach whether any other factors identified by Plaintiffs are indicative of pretext. As Plaintiffs have presented a material issue of fact as to whether Defendant followed its policies while conducting layoffs, Defendant's Motion for Summary Judgment as to Plaintiffs' claims for disparate treatment discrimination under the ADEA and the NYSHRL is denied.

c.  Retaliation

Preuss and Cafiero also bring claims for retaliation under the ADEA and the NYSHRL.[26]

(Compl. ¶¶ 17(a), 40; Ps' Opp. 28-30.)  The ADEA prohibits discrimination in retaliation for an

employee's opposition to discriminatory practices.  *See Gomez-Perez v. Potter*, 553 U.S. 474,

491 (2008).  Plaintiffs' claims for retaliation are also analyzed under the *McDonnell Douglas*

burden-shifting framework discussed above.  *See Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170,

1177-78 (2d Cir. 1996) (analyzing Title VII and NYSHRL retaliation claims under same burden-

shifting standard); *Terry*, 336 F.3d at 141 (same standards apply to retaliation claims under Title

VII and ADEA).  To make out a *prima facie* case of retaliation under the ADEA, a plaintiff must

establish that:  "(1) [he] participated in a protected activity; (2) [he] suffered an adverse

employment action; and (3) a causal connection exists between [his] protected activity and [his]

adverse employment action."  *Dixon*, 416 F. App'x at 110.

i.  Preuss

Preuss was laid off in May 2009, (Ps' 56.1 ¶ 108), and he filed his age discrimination

complaint with the EEOC on November 20, 2009, (Massen MSJ Aff. Ex. R, at 3; Compl. ¶ 7).

On April 14, 2010, Matos sent Preuss a letter explaining that because Defendant had been unable

to recall Preuss for employment, he would be terminated effective April 30, 2010.  (*See* Massen

MSJ Aff. Ex. XX, at 1.)  The letter also informed Preuss that he was eligible to receive a

severance package, but only if he "waiv[ed] and releas[ed] all rights [he] may have against

[Defendant], including, but not limited to, any rights [he] may have under the [ADEA]."  (*Id.*)

---

[26] Bloomer also alleged that Defendant retaliated against him by denying him severance pay after he filed an age
discrimination complaint with the Equal Employment Opportunity Commission ("EEOC").  (Compl. ¶ 23.)  In their
opposition, Plaintiffs defended Preuss's and Cafiero's claims for retaliation, but failed to respond to Defendant's
arguments that Bloomer's retaliation claims should be dismissed.  (*See* Ps' Opp. 28-30 ("Defendant Retaliated
Against Cafiero and Preuss").)  Accordingly, Bloomer's claims for retaliation under the ADEA and the NYSHRL
are deemed abandoned and dismissed.  *See Taylor*, 269 F. Supp. 2d at 75; *Douglas*, 21 F. Supp. 2d at 393.

Preuss declined Defendant's severance package because he did not want to sign the waiver and release.  (*See id.* Ex. YY, at 1) ("I would be willing to sign the agreement if it did not have the stipulation of giving up my other rights.").)

Preuss seems to be alleging that Defendant's severance policy requiring a release of all claims was instituted to retaliate against him for filing his EEOC complaint.[27]  (*See* Compl. ¶ 17(a); Preuss Dep. 115; Massen MSJ Aff. Ex. YY, at 1 ("I was not aware of the new policy on severance pay. . . . It used to be that Kolmar employees did not have to sign an agreement to receive their severance pay.").)  Defendant contends that Preuss cannot make out a *prima facie* case because he has failed to establish that a causal connection existed between his complaint and Defendant's change in severance policy.  (D's Mem. 21-22.)  Plaintiffs did not address Defendant's contention in their opposition.  Although Preuss's retaliation claim regarding the release could be deemed abandoned accordingly and dismissed on that basis alone, *see Taylor*, 269 F. Supp. 2d at 75, I will address the merits.

Defendant alleges that when the possibility of relocation arose in 2009, its Board of Directors instructed Matos to analyze its severance policy and revise it in light of Defendant's existing financial difficulties and the possibility of layoffs.  (D's Mem. 22; Matos Dep. 32-33.) Matos revised the policy, and it went into effect on September 1, 2009, over two months before Plaintiffs filed their EEOC complaints.  (Matos Dep. 33; Massen MSJ Aff. Ex. CC.)   It may be

---

[27] Plaintiffs dispute Defendant's characterization of Preuss's retaliation claim.  (*See* D's 56.1 ¶ 115 ("Preuss believed that Kolmar's severance policy requirement that laid off employees execute a waiver and release was retaliatory."); Ps' 56.1 ¶ 115 ("Disputed.  The cited testimony does not state that the waiver is retaliatory.").)  The testimony from Preuss's deposition that Defendant cites, however, supports its characterization.  (*See* Preuss Dep. 114-15 ("Q:  What is the basis for the allegation in the complaint that Kolmar retaliated against you by denying you severance pay.  A:  The original policy for many years was you didn't have to sign giving up your rights, apparently that changed.").)  Although I understand that Preuss in his deposition may not have articulated the basis for his claim in the way Plaintiffs' counsel may have, it is not clear to me that Plaintiffs have alleged any other facts from which his claim could arise.  As Defendant offered Preuss a severance package after he filed his EEOC complaint, Preuss cannot plausibly allege that he was denied severance in its entirety, only that the terms of the severance package were retaliatory.

true that the severance policy was revised in anticipation of potential lawsuits arising from the

layoffs – it is, after-all, called the "Special Reduction in Force Severance Pay Plan" – but even if

that is the case, it cannot be that the plan was instituted to retaliate against Preuss, who did not

file his EEOC complaint until two months after the policy's adoption.  Preuss was offered

severance, yet declined it because he did not want to comply with the policy's terms.  While his

actions are understandable, they do not make room for any inference that Defendant denied

Preuss severance to retaliate against him for filing an age discrimination complaint.

In their opposition, Plaintiffs completely change course and argue that Preuss was laid off

in retaliation for an internal complaint of age discrimination that he allegedly made to Luckey

one week prior to his termination.  (Ps' Opp. 29.)  The Complaint contains no factual allegations

regarding this alleged internal complaint, and focuses solely on the denial of severance as the

basis for his retaliation claim.  (Compl. ¶ 17(a).)  Accordingly, I will not consider this argument

in resolving Defendant's Motion for Summary Judgment.  *See Wilson v. City of N.Y.*, 480 F.

App'x 592, 594 (2d Cir. 2012) ("[I]t is inappropriate to raise new claims for the first time in

submissions in opposition to summary judgment.") (internal quotation marks omitted);

*Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach merits of

argument raised for first time in opposition to summary judgment); *Syracuse Broad. Corp. v.

Newhouse*, 236 F.2d 522, 525 (2d Cir. 1956) (holding district court was "justified" in "brush[ing]

aside" further argument not alleged in complaint but raised for the first time in summary

judgment).

Accordingly, Defendant's Motion for Summary Judgment is granted as to Preuss's

retaliation claims under the ADEA and the NYSHRL.

ii.   <u>Cafiero</u>

Cafiero was originally laid off in June 2009.  (Ps' 56.1 ¶ 117.)  Like Preuss, Cafiero filed

his age discrimination claim with the EEOC on November 20, 2009.  (Massen MSJ Aff. Ex. T, at

3; Compl. ¶ 7).  Approximately two months later, on January 14, 2010, Defendant recalled

Cafiero as a Purchasing Agent.  (Ps' 56.1 ¶¶ 227-28, 231.)  Cafiero contends that his subsequent

termination on April 19, 2010 occurred in retaliation for filing the EEOC complaint.  (Compl. ¶

40; Ps' 56.1 ¶ 233.)

Defendant argues that Cafiero cannot establish a causal connection between his EEOC

complaint and his termination because he was recalled after he filed his complaint.[28]  (D's Mem.

22-23.)  Cafiero contends, however, that the EEOC Notice of Charge of Discrimination (the

"Notice of Charge") was dated January 14, 2010, so even if it was mailed the same day,

Defendant could not have received it before he was recalled.  (Ps' 56.1 ¶ 230; Ps' Opp. 29-30;

*see* Massen MSJ Aff. Ex. T, at 1.)  He thus argues that the recall cannot evidence an absence of

retaliatory motive.  Although Valentia believes that she received the Notice of Charge prior to

Cafiero's recall, (D's 56.1 ¶ 231), the jury would not be required to accept that testimony, *see*

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000); *In re Dana Corp.*, 574

F.3d 129, 152 (2d Cir. 2009), especially where there is record evidence (the date of the Notice of

Charge) suggesting otherwise, *see Hayes*, 84 F.3d at 619 (district court "should not weigh

evidence or assess the credibility of witnesses" in reviewing motion for summary judgment).

Thus, assuming Defendant received the Notice of Charge after January 14, 2010, the recall

---

[28] Defendant also contends that Cafiero cannot show that he suffered an adverse employment action based on his participation in a protected action.  (D's Mem. 22.)  This argument, however, is more logically construed as one alleging that his termination – the alleged adverse employment action – was not causally related to his filing of the EEOC complaint, as it is well-settled that an employee's termination constitutes an adverse employment action.  *See Terry*, 336 F.3d at 138 (termination is example of materially adverse change).

occurred before Defendant knew of the EEOC charge and the recall thus does not defeat a

retaliation claim arising from Defendant terminating Cafiero approximately three months later.

In the absence of direct evidence, the causal connection "can be established indirectly by

showing that the protected activity was closely followed in time by the adverse action,"

*Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.

1988), but "the cases that accept mere temporal proximity between an employer's knowledge of

protected activity and an adverse employment action as sufficient evidence of causality to

establish a *prima facie* case uniformly hold that the temporal proximity must be very close,"

*Cunningham v. Consol. Edison Inc.*, No. 03-CV-3522, 2006 WL 842914, at *19 (E.D.N.Y. Mar.

28, 2006) (internal quotation marks omitted).  The Second Circuit "has not drawn a bright line to

define the outer limits beyond which a temporal relationship is too attenuated to establish a

causal relationship between the exercise of a federal constitutional right and an allegedly

retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554-55 & n.5 (2d

Cir. 2001) (collecting cases), but district courts in the Circuit have held that "a passage of more

than two months between the protected activity and the adverse employment action does not

allow for an inference of causation," *Walcott v. Cablevision*, No. 10-CV-2602, 2012 WL

4447417, at *14 (E.D.N.Y. Sept. 24, 2012); *see Hollander v. Am. Cyanamid Co.*, 895 F.2d 80,

85-86 (2d Cir. 1990) (upholding district court's grant of summary judgment on retaliation claim

where three months between protected activity and termination, and no other evidence of causal

nexus); *Hussein v. Hotel Emps. & Restaurant Union, Local 6*, 108 F. Supp. 2d 360, 367

(S.D.N.Y. 2000) ("[T]he passage of more than two months defeats any retaliatory nexus."),

*vacated on other grounds*, 14 F. App'x 39 (2d Cir. 2001); *Nicastro v. Runyon*, 60 F. Supp. 2d

181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three

months elapse between the protected . . . activity and the alleged act of retaliation."); *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two-and-a-half months is "hardly the close proximity of time contemplated . . . for allowing a plaintiff to establish the 'causal connection' element of retaliation claim").  As Cafiero's termination came approximately three months after he alleges Defendant received his Notice of Charge, the passage of time is not sufficiently close to establish a causal connection.[29]

As Plaintiffs have not presented any other evidence – direct or circumstantial – to support their allegation that Cafiero's termination occurred in retaliation for his EEOC complaint, Defendant's Motion for Summary Judgment is granted as to Cafiero's retaliation claims under the ADEA and the NYSHRL.

## IV.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART and Plaintiffs' Motion to Strike is GRANTED IN PART and DENIED IN PART.  Plaintiffs' claims for retaliation under the ADEA and the NYSHRL are dismissed, and the Affirmations of Concita May and Lisa Smith are stricken from the record. Preuss's and Cafiero's claims for hostile work environment and all Plaintiffs' claims for age discrimination under the ADEA and the NYSHRL remain.  The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 45, 55).  The parties are to appear for a status conference on **September 27, 2013 at 3:45 p.m.**

**SO ORDERED.**

---

[29] Plaintiffs cite *Gorzynski*, 596 F.3d 93, and *Gorman-Bakos*, 252 F.3d at 554-55 in support of their argument that Cafiero's termination three months after Defendant learned of his EEOC Complaint is sufficient to establish a causal nexus.  (Ps' Opp. 29.)  *Gorzynski* and *Gorman-Bakos*, however, can be distinguished from the present case.  *See Gorzynski*, 596 F.3d at 110 (causal nexus where protected activity occurred within *one month* of plaintiff's termination); *Gorman-Bakos*, 252 F.3d at 555 (causal nexus where protected activity spanned nine months and continued until just days before adverse action occurred).  Cafiero's sole complaint, made three months prior to his termination, is insufficient standing alone to demonstrate a causal nexus.

Dated:  September 4, 2013
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.